**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

I, Kachine Jonese, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since June 2021.  I am currently assigned to the ATF Louisville Field Division, Charleston, WV Field Office.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a white in color Apple iPhone, more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

3.      The contents of Attachment "A" and Attachment "B" to this Affidavit and application for a search warrant are hereby incorporated by reference.

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

5.     Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## STATUTORY AUTHORITY

6.     This investigation concerns alleged violations of federal law, including but not limited to violations of 18 U.S.C. § 922(a)(6) (Making False Statements); 18 U.S.C. § 922(g)(3) (Unlawful Possession of Firearms by Person Addicted to Controlled Substances); 18 U.S.C. § 924(a)(1)(A) (Providing False Information); 18 U.S.C. § 932(b) (Straw Purchase of Firearms); 18 U.S.C. § 933 (Trafficking in Firearms); and 18 U.S.C. § 371 (Conspiracy).

## AFFIANT'S TRAINING AND EXPERIENCE

7.     Your Affiant is currently employed as a Special Agent with the ATF.

8.     Your Affiant graduated from the Federal Law Enforcement Training Center, where I learned basic criminal investigation techniques. In addition, I graduated from the ATF National Academy, where I learned about federal firearms laws, federal explosives laws, bomb scene investigations, and arson investigations.

2

**9.**    Your Affiant has received investigative training, conducted, and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances.  These acts commonly involve the criminal use and transfer of firearms, illicit drug trafficking, acts of arson, criminal possession, or use of explosives, and/or destructive devices.

**10.**    In my current position as an ATF Special Agent assigned to the Charleston, WV Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws.  Within that role, my job duties include, but are not limited to:

    **a.** Functioning as a case agent, which entails the supervision of specific investigations.

    **b.** Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts.

    **c.** Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms.

    **d.** Drafting, obtaining and executing search warrants.

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

11.    Your Affiant is personally, and professionally, familiar with cellular telephones or mobile telephones.

12.    I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communications between parties in remote locations.

13.    I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

14.    In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location.

15.    Based on my knowledge, training, and experience, I know that cellular phones, such as the Apple iPhone described in Attachment "A," can store electronic information for long periods

4

of time.    This information can sometimes be recovered with forensics tools.

16.    Based on my training and experience, I know that it is a common practice for drug/firearm traffickers to use and keep cellular telephones in order to facilitate their drug/firearm trafficking business. Cellular telephones allow traffickers to remain in close and nearly instantaneous communication with their customers and suppliers.

17.    In my experience, it is common for cellular telephones used by drug/firearm distributors and drug/firearm users to contain evidence of drug/firearm trafficking.    This evidence includes call logs, text messages, stored emails, contact lists, photographs and video images of drugs/guns, drug proceeds, and drug/firearm trafficking paraphernalia and activity, and other information.    It is also common for drug/firearm users to utilize cell phones to obtain drugs or firearms.

18.    I also know from my training and experience that the electronic memories of cell phones, including social media applications, have been found to contain evidence of illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, and the motivation for possessing the illegal firearm.

**19.**   I also know that people who sell or possess firearms illegally frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, their property, and assets with cell phones. They also frequently utilize cell phones as a way to communicate with other individuals in order to purchase or sell firearms.

### FEDERAL FIREARMS LICENSING

**20.**   Federal law requires any person engaged in the business of dealing in firearms to be licensed by ATF. Persons so licensed are known as FFLs. Federal law requires FFLs to maintain certain records relating to the acquisition and disposition of firearms. The most common record is ATF Form 4473 ("4473"), which is used to record over-the-counter sales of firearms. The 4473 requires the buyer of a firearm to provide his or her name, current address, and other identifying information. The buyer must also present the FFL with a valid government-issued photo identification.

**21.**   The 4473 also requires the buyer to answer a series of questions related to the lawfulness of sale, including whether he or she is the actual buyer of the firearm. The form contains a warning in emboldened text: "**Warning: You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person.   If you are not the actual**

transferee/buyer, the licensee cannot transfer any of the firearm(s) to you."

22.   At the conclusion of the series of questions, the 4473 requires the purchaser of a firearm to sign his or her name and "**certify that [his or her] answers [to the questions] are true, correct, and complete.**" This certification paragraph appears directly above the line where the purchaser must sign his or her name.

23.   In addition to the certification, the certification paragraph includes the following acknowledgements in emboldened text:

  a. "**I understand that answering 'yes' to [the question asking whether the buyer is the actual buyer of the firearm(s)] if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law.**"

  b. "**I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law.**"

  c. "**I further understand that the repetitive purchase of firearms for the purpose of resale to predominantly earn**

**a profit without a Federal firearms license is a violation of Federal law."**

**FIREARMS TRAFFICKING**

24.     Historically, "firearms trafficking" has been a law enforcement term, not a legal one.  It was used to describe a number of schemes employed to move firearms from the legal market to the illegal one, to include a "straw purchase." A straw purchase is where the person who completed the 4473 (the straw purchaser) was not the actual buyer, but rather acquired the firearm on behalf of another person (the actual buyer). Straw purchases conceal the identity of the actual buyer, who is typically someone prohibited from possessing firearms and thus unable to purchase the firearm on his or her own behalf.  Another scheme individuals employ to move firearms from the legal market to the illegal one relates to dealing in firearms without a license, which is described in more detail below.

25.     More recently, though, with the passage of the Bipartisan Safer Communities Act in 2022 — and specifically, Section 12004 of that legislation, the Stop Illegal Trafficking in Firearms Act — criminal "straw purchasing" and "firearms trafficking" statutes were added to Title 18 of the United States Code as follows:

    a. <u>Straw Purchasing of Firearms:</u> 18 U.S.C. § 932 makes it "unlawful for any person to knowingly purchase, or

conspire to purchase, any firearm in or otherwise affecting interstate or foreign commerce for, on behalf of, or at the request or demand of any other person" who meets certain characteristics enumerated in the statute.

b. <u>Trafficking in Firearms:</u> 18 U.S.C. § 933 makes it "unlawful for any person to . . . ship, transport, transfer, cause to be transported, or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony" or to "receive from another person any firearm in or otherwise affecting interstate or foreign commerce, if the recipient knows or has reasonable cause to believe that such receipt would constitute a felony."

26.    To identify firearms trafficking schemes, ATF analyzes traces of firearms recovered in crimes, "multiple sales" reports (FFLs are required to report the sale of two (2) or more handguns to a single buyer in a five (5)-day period), and other law enforcement data to look for common firearms trafficking indicators.   These indicators include firearms recovered ("recoveries") with a short "time-to-crime" (the length of time between the sale of the firearm and its recovery by law

9

enforcement), traces of firearms sold as part of a multiple sale, frequent or repetitive purchases of the same or similar firearms, or firearms reported stolen soon after purchase (to conceal the link between the trafficker and the buyer of the firearm in case it is recovered in a crime).

27.    Further, firearms traffickers can be prosecuted using a number of other statutes that make their underlying conduct illegal. For example:

    a. Making False Statements: 18 U.S.C. § 922(a)(6) prohibits knowingly making a false statement to an FFL in connection with the acquisition or attempted acquisition of a firearm, or furnishing any false, fictitious, or misrepresented identification, intended or likely to deceive the FFL with respect to any fact material to the lawfulness of the sale.

    b. Providing False Information: Similarly, 18 U.S.C. § 924(a)(1)(A) prohibits knowingly making a false statement with respect to information required to be kept in an FFL's records (such as a person's name, current address, or the identity of the actual buyer of a firearm).

    c. Conspiracy: 18 U.S.C. § 371 makes it a crime to conspire to commit an offense against the United States.

## DEALING IN FIREARMS WITHOUT A LICENSE

28.    18 U.S.C. § 922(a)(1)(A) makes it unlawful to willfully "engage in the business" of dealing in firearms without a license. Under federal law, a person engaged in the business of dealing in firearms is "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C).  Conducting business "to predominantly earn a profit" "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).  Federal law explicitly exempts persons "who make[] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sell[] all or part of [their] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C).

29.    Federal law does not establish a "bright line" rule for when a license is required; there is no specific threshold number or frequency of sales, quantity of firearms, or amount of profit or time invested that triggers the licensure requirement. Instead, determining whether someone is "engaged in the business" of dealing in firearms is a fact-specific inquiry into factors such as whether the person represents him- or herself as a source

11

of firearms; whether he or she repetitively buys and sells firearms; the timing and circumstances under which the person is selling firearms; and whether he or she intends to earn a profit. No single factor is determinative, and the relative importance of any of the factors will vary depending on the facts and circumstances applicable to the individual seller.

30.    For instance, it is relevant whether a person represents him- or herself as a source of firearms, whether he or she takes orders or obtains specific firearms for buyers, whether he or she offers to buy firearms to immediately resell, whether he or she repetitively acquires and resells firearms in unopened, original packaging, or in new condition, and what price or fees he or she charges for firearms. Courts have found that even a few firearm transactions, when combined with other evidence, can be sufficient to establish that a person is "engaged in the business" of dealing in firearms. For example, courts have upheld convictions for dealing without a license when as few as two firearms were sold, or when only one or two transactions took place.

31.    Based on my knowledge, training, and experience, I know that firearms traffickers often utilize cellular and other electronic devices, and social media and other applications and other photographic and written records contained within such devices, to communicate with other persons to acquire, facilitate

12

the purchase, sale, or transport of, and/or otherwise traffic such firearms.

## PROBABLE CAUSE

32.     On April 7, 2023, Charleston Police Department ("CPD") Special Enforcement Unit ("SEU") Detectives received information from a confidential informant ("CI") in reference to an individual later identified as Curon Cameron CORDON who was suspected of selling fentanyl pills in the area of Charleston, WV. On this same date SEU Detectives utilized a CI to conduct a controlled purchase of five (5) suspected fentanyl pills from an individual later identified as Jesus Emmanuel DAVIS in exchange for $125 of pre-recorded United States Currency.   DAVIS delivered the suspected fentanyl pills to the CI at the direction of CORDON.

33.     On April 13, 2023, CPD SEU Detectives utilized a CI to purchase from CORDON five (5) suspected fentanyl pills and one (1) suspected alprazolam pill in exchange for $125 of pre-recorded United States Currency. During the controlled purchase, CORDON advised that he primarily sells marijuana and firearms.   CORDON also stated he travels back and forth from New York to conduct business.

34.     On April 20, 2023, CPD SEU Detectives utilized a CI to purchase from CORDON three (3) suspected fentanyl pills in exchange for $125 of pre-recorded United States Currency.   During the controlled purchase, CORDON informed the CI that he could

sell the CI an assault-style rifle for $900 in United States Currency.

35.     On May 17, 2023, CPD SEU Detectives and members of the ATF utilized a CI to purchase from CORDON ten (10) suspected fentanyl pills and three (3) firearms in exchange for $3,000 of pre-recorded United States Currency.   During the controlled purchase, the CI entered a white in color Nissan Altima, bearing WV temporary registration 432143, with CORDON and his girlfriend, Maia MARTISKO.   CORDON and MARTISKO provided the CI a box containing a Ruger, Model LCP, .380 caliber pistol, SN: 372494946, and a NAA, Model Mini LR, .22 caliber revolver, SN: L264741. According to the 4473 for these firearms, the firearms were purchased by Kayla MCCALLISTER from FFL Spring Hill Rod and Gun, 4961 MacCorkle Avenue Southwest, South Charleston, Kanawha County, WV 25309, telephone number 304-768-2090, on May 12, 2023. The address MCCALLISTER supplied in connection with the 4473 was 132 Swinburn Street, Charleston, Kanawha County, WV 25302.

36.     During the May 17, 2023, controlled purchase, speaking about MCCALLISTER, CORDON stated, "The first thing on her mind is, 'How am I going to get money so I can make sure that I'm able to pay for my habit?'"   Further, CORDON stated he was going to pay MCCALLISTER $50 for facilitating the firearms transaction. Based on my knowledge, training, and experience, I know that straw purchasers of firearms are often drug addicts who buy firearms on

14

behalf of other individuals in exchange for money used to support their drug habits. MCCALLISTER has been observed multiple times per day, on a near daily basis, at a residence known to me as a location where drug activity is taking place. The fentanyl pills the CI purchased from CORDON on May 11, 2023, May 17, 2023, May 24, 2023, and May 31, 2023, were obtained from that residence on those dates.

37.   After the CI received the two (2) firearms from CORDON and MARTISKO on May 17, 2023, CORDON drove the CI to South Charleston, Kanawha County, WV to obtain the third firearm. While waiting for the third firearm, CORDON communicated with MCCALLISTER for status updates regarding MCCALLISTER's purchase of the third firearm. For instance, MCCALLISTER told CORDON that she was going inside the store to make the purchase and, later, that the store was completing the paperwork for the purchase. CORDON also told MCCALLISTER to meet them at a nearby Dollar General store after she had purchased the firearm. There is probable cause to believe that these communications occurred via cell phone.

38.   At the time MCCALLISTER was believed to be completing the purchase of the third firearm, ATF SA Jarrod Chittum entered Spring Hill Rod and Gun and observed MCCALLISTER completing a 4473. After exiting the business, SA Chittum observed MCCALLISTER load the purchased firearm into a grey in color Chrysler 200

(bearing WV registration 49H783).  MCCALLISTER exited the area of FFL Spring Hill Rod and Gun and drove to Dollar General, 800 Chestnut Street, South Charleston, Kanawha County, WV 25309, where she met with CORDON.  A review of Dollar General surveillance video showed MCCALLISTER placing the rifle she had purchased into the trunk of CORDON's vehicle.  The rifle, identified as an Alex Pro, Model Guardian, 5.56 caliber rifle, SN: AM024153, was ultimately given to the CI prior to the CI's return to a pre-determined meeting location.  The rifle purchased by MCCALLISTER was therefore sold as part of the deal between the CI and CORDON.

**39.**  On May 24, 2023, CPD SEU Detectives and members of the ATF utilized a CI to purchase from CORDON fifteen (15) suspected fentanyl pills and a Smith & Wesson, Model SD40, .40 caliber pistol, SN: FDX2075, in exchange for $1,000 of pre-recorded United States Currency.  A review of records at FFL KV Jewelry and Loan, 6 Dunbar Avenue, Dunbar, Kanawha County, WV 25064, revealed this firearm was purchased by MCCALLISTER on May 22, 2023.  Agents also learned from the review of records that on April 24, 2023, MCCALLISTER purchased a Glock, Model 19 GEN 4, 9-mm caliber pistol, SN: BNYN969. To date, this Glock firearm has not been recovered/purchased as part of this investigation.

**40.**  On May 31, 2023, CPD SEU Detectives and members of the ATF utilized a CI to purchase from CORDON thirteen (13) suspected

fentanyl pills and a Glock Model 19, 9-mm caliber pistol, SN: BKVD571, in exchange for $1330 of pre-recorded United States Currency. A review of records at FFL KV Jewelry and Loan revealed this firearm was purchased by MCCALLISTER on May 30, 2023.

41.    On May 31, 2023, your Affiant and SA Chittum traveled to FFL Spring Hill Rod and Gun to obtain additional information related to firearms purchases made by MCCALLISTER. According to the 4473 dated May 26, 2023, MCCALLISTER purchased a North American Arms, Model Mini Revolver, .22 mag caliber revolver, SN: E472278; a Ruger, Model LCP, .380 caliber pistol, SN: 372500915; a Trailblazer, Model Lifecard, .22 caliber pistol, SN: 40668; and a Ruger, Model LCP, .380 caliber pistol, SN: 372500721. To date, none of these four (4) firearms have been recovered/purchased as part of this investigation. The invoice from the May 26, 2023 purchase reflects that MCCALLISTER paid a total of $1,040 in United States Currency for the firearms and used her debit card to pay the remaining balance of $69.96.

42.    On June 8, 2023, ATF SA Sean McNees and Huntington Police Department Detective Adrian Rosario received information from a cooperating source related to MCCALLISTER. According to the cooperating source, MCCALLISTER has purchased approximately five (5) firearms in the past few months for another individual in exchange for approximately $50 United States Currency per firearm. The cooperating source also stated that MCCALLISTER

purchased a Glock firearm for her boyfriend, whom the cooperating source believes is a convicted felon. The cooperating source also stated that MCCALLISTER is a "junkie" who takes pills. Further, the cooperating source advised that MCCALLISTER lives with her boyfriend at 132 Swinburn Street, Charleston, Kanawha County, WV 25302.

## SEARCH WARRANT

**43.** On June 15, 2023, members of the ATF Charleston Field Office and the CPD SEU executed a federal search warrant at 132 Swinburn Street, Charleston, Kanawha County, WV 25302. This is the residence of Kayla MCCALLISTER. During the search of the residence, the Apple iPhone identified in Attachment "A" was located in MCCALLISTER's bedroom, on what she identified as her side of the bed, and taken into ATF custody. Also located were receipts for firearm purchases and evidence of drug usage, to include cut straws, a glass smoking pipe, and plastic baggies containing residue consistent with drugs.

## INTERVIEW

**44.** Following the execution of the search warrant at 132 Swinburn Street, Charleston, Kanawha County, WV 25302, MCCALLISTER agreed to speak with ATF Special Agents, and a Mirandized recorded interview was conducted. MCCALLISTER told Agents that CORDON asked her to purchase firearms for him and offered to pay her for doing so. She stated that CORDON would

tell her which firearms to purchase and would provide her with the money to purchase the firearms. MCCALLISTER estimated she made a total of $700-$800 United States Currency purchasing firearms for CORDON, and that every firearm she purchased went to CORDON.

45.     MCCALLISTER also stated DAVIS would sometimes utilize her "Cash App." Cash App is a mobile payment service that allows users to transfer money to each other via a cell phone application. MCCALLISTER clarified that DAVIS would send money to her via Cash App, then use her debit card to withdraw the money because he did not have a card.

46.     Regarding her drug use, MCCALLISTER stated she did not use heroin but did take Percocet pills and "sometimes" used the Percocet pills daily. MCCALLISTER also stated she had purchased pills from DAVIS and would buy them usually one (1) or two (2) at a time for approximately $20 United States Currency per pill.

## CUSTODY OF THE CELLULAR TELEPHONE

47.     The Apple iPhone described in Attachment "A" was seized by law enforcement during the search warrant conducted at 132 Swinburn Street, Charleston, Kanawha County, WV 25302, the residence of Kayla MCCALLISTER. After the Apple iPhone was seized, it was taken to the ATF Charleston, WV Field Office, 300 Summers Street, Charleston, WV 25301, where it was placed in the evidence vault.

48.     In my training and experience, I know that the Apple iPhone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the phone first came into the possession of ATF.

## NATURE OF THE EXAMINATION

49.     There is probable cause to believe that evidence that was once stored on the Apple iPhone described in Attachment "A" may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is because when a person "deletes" a file on a cell phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space for long periods of time before they are overwritten.  "Free space" or

"slack space" refers to space on the storage medium that is not currently being used by an active file. Additionally, a cellular phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory, or "cache."

50.   As further described in Attachment "B," this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Apple iPhone described in Attachment "A" was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Apple iPhone described in Attachment "A" because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

**b.** Forensic evidence on a device can also indicate who has used or controlled the device.

**c.** A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

**d.** Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.

**51.** Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**52.** Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for

the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

**53.** Based on my training, education, experience and discussions with other trained investigators, I know that persons who sell or possess firearms frequently take or cause to be taken photographs or other images of themselves, their associates, their property and assets with cellular phones. Persons who sell firearms communicate with each other via cellular phones while transporting firearms and currency. They also utilize cellular phones to discuss criminal activity before, during, and after a particular criminal act.

**54.** Based on my training, education, experience, and discussions with other trained investigators, I also know that most firearm traffickers are like any other individuals in our society, in that they maintain certain records on their cellular telephones. These records will normally be retained for long periods regardless of whether their value to the individual has diminished.  This type of evidence is often generated, maintained, and subsequently forgotten about. Hence, records maintained in cellular phones, that one would normally think a prudent person would destroy because of their incriminating nature, are still possessed months or even years after they came into the possession of the firearm trafficker.  Some individuals

do not even realize the incriminating nature of the records they keep, including e-mails, text messages and photographs.

55.   Based on my training, education, experience, and discussions with other trained investigators, I also know that Cash App is a mobile/cell phone-based application and records pertaining to transactions are likely to be located on a user's cell phone.

56.   Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of 18 U.S.C. § 922(a)(6) (Making False Statements); 18 U.S.C. § 922(g)(3) (Unlawful Possession of Firearms by Person Addicted to Controlled Substances); 18 U.S.C. § 924(a)(1)(A) (Providing False Information); 18 U.S.C. § 932(b) (Straw Purchase of Firearms); 18 U.S.C. § 933 (Trafficking in Firearms); and 18 U.S.C. § 371 (Conspiracy) will be found on the Apple iPhone described more completely in Attachment "A."

57.   WHEREFORE, your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Apple iPhone described in Attachment "A" to seek the items described in Attachment "B."


Further your affiant sayeth naught.

Kachine Jonese
Special Agent, ATF


Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure this the ___11th___ day of July, 2023.

DWANE L. TINSLEY
United States Magistrate Judge